# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DONALD L. GARRETT, | : | Case No. 3:17-cv-00049 |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by consent of the parties) |
| vs. | : | |
| NANCY A. BERRYHILL, Commissioner Of The Social Security Administration, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I.  Introduction

Plaintiff Donald L. Garrett brings this case challenging the Social Security Administration's partial denial of his applications for disability-based benefits. He applied for benefits—Disability Insurance Benefits and Supplemental Security Income—in August 2013, asserting that as of October 10, 2007, he could no longer work due to his many health problems, including (in part) Crohn's disease, acid reflux, pain in his abdomen and lower back, and shortness of breath.

The Social Security Administration, mainly through a decision by Administrative Law Judge (ALJ) Benjamin Chaykin, partially granted and partially denied Plaintiff's applications based on two conclusions: (1) he was not under a disability from October 10, 2007 to May 30, 2014; (2) he was under a disability starting on May 31, 2014. (Doc. #6, *PageID* #s 101-13).

Plaintiff now contends that ALJ Chaykin erred by failing to properly evaluate the evidence concerning his physical impairments before May 31, 2014—particularly his Crohn's disease. He argues that the ALJ improperly attempted to explain away the severity of his Crohn's disease based on treatment notes showing the disease was "stable" before May 31, 2014. Plaintiff further argues that the ALJ improperly discredited his symptom severity because he was allegedly "noncompliant" with his treatment regimen.

The Commissioner finds no error in the ALJ's decision and contends that even if some evidence of record could justify other findings, substantial evidence supports the ALJ's findings concerning the medical evidence predating May 31, 2014.

## II. Plaintiff and the Administrative Hearing

Plaintiff was under fifty years old on his alleged disability onset date. He is thus a "younger person" under social security regulations. 20 C.F.R. §§ 404.1563(c).[1] He has a high-school education. His past jobs involved work as a janitor and a machine operator.

At an administrative hearing in August 2015, Plaintiff testified that he is 5 feet 11 inches tall and weighs approximately 166 pounds. He was separated from his wife at that time. He lived with his sister, sleeping on her couch on the first level. (Doc. #6, *PageID* #126). He has to climb the stairs to the second level to find a bathroom with a shower. When he does this, he gets out of breath. *Id.* at 129. He explained, "My bones ache and…, I cramp a lot…." *Id.* He does not shower every day.

Plaintiff indicated that he had to quit his last job (a part-time job) cleaning and performing maintenance because he kept getting sick and going to the emergency room. *Id.*

---

[1] Citations to Disability Insurance Benefits regulations also refer to the Court's consideration of the corresponding Supplemental Security Income regulations.

at 131-32. He needed to empty his colostomy bag every 20 to 30 minutes, which made it difficult for him to even sleep. *Id.* at 133-34, 139. The insertion site of his colostomy bag would get infected a lot because it was hard for him to care for the site due to his "hands cramping all the time. *Id*. at 133. He was consequently in and out of the hospital for treatment.

Plaintiff also has problems with his heart. When asked why he quit is part-time job, he testified:

> The thing of it is I kept getting sick. Like … one time after shoveling snow I got sick and had to go to the hospital for three days because my heart was all out of synch. I can drink a glass of cold water and it just start[s] beating rapidly. And I think I got sick … in May. I don't know if it was my Crohn's.
>
> I forgot. Either I was going to the hospital for that [Crohn's disease] or going to the hospital for my heart….

*Id*. at 134.

Plaintiff also indicated that before he began to use a colostomy bag, he would "have accidents on [him]self." *Id*. at 139. He explained, "So that was another concern about me really holding a job basically. I couldn't make it to the restroom in time. I could be riding down the street and I have to use the restroom." *Id*.

On a typical day, Plaintiff testified that his sister helped him fix something to eat. He takes his medications for his heart problem, Crohn's disease, anxiety, and depression. He also takes iron supplements. During a typical day, he lies down unless he has a doctor's appointment. *Id.* at 136.

Plaintiff also has difficulty breathing, starting a year before the ALJ's hearing. Physical activity, even just talking, can affect his breathing. *Id*. at 139. He had to stop four

3

times while he was walking the two and a half blocks to the administrative hearing. *Id.* at 140. He noted he gets dizzy when he bends over. He cannot tie his shoes, so he wears slip-on shoes or slippers. *Id*. He rarely left the house to do anything. *Id.*

When questioned by his attorney, Plaintiff testified that he had lost at least 50 pounds from his highest weight between 220 and 230 pounds. He believes it is due to his Crohn's disease, and he was bleeding a lot before he began using a colostomy bag. He was hospitalized for blood loss. *Id.* at 141. He had been treated with Remicaid injections in 2004, which caused "a real bad infection in [his] leg… inside [his] bone." *Id.* at 142. He reported, "I couldn't walk it was so painful." *Id.* at 143. He had also been treated with Humira injections, but he believes that Humira caused him to need a colostomy bag. He was once rushed to the hospital with emergency surgery due to a hole in his intestine. *Id.* He explained that both the Remicaid and Humira made his Crohn's disease worse due to significant side effects. *Id*. at 143-44.

The other witness during the administrative hearing was a vocational expert. He testified that a hypothetical person with Plaintiff's age, education, work experience, and residual functional capacity before May 31, 2014 could perform a significant number of jobs in the national economy such as a survey worker, production assembler, or a mail clerk. *Id.* at 146-47. The vocational expert also testified that if this hypothetical person would also be off task more that than 15% of the workday beyond normal breaks, he "would be subject to disciplinary action and subsequent termination." *Id.* at 148.

## III. Medical Evidence[2]

### Aaron L. Knoll M.D.

Plaintiff received treatment from gastroenterologist, Dr. Knoll beginning in March 1999, when he was hospitalized for respiratory failure. Dr. Knoll was consulted due to upper gastrointestinal bleeding from his gastrointestinal tube. Dr. Knoll diagnosed gastrointestinal bleeding from Plaintiff's upper track, *i.e.* a peptic ulcer. *Id.* at 480-82.

Dr. Knoll saw Plaintiff in mid-2007, several months before his asserted disability onset date of October 10, 2007. Progress notes from then until November 2010 indicate that Plaintiff often reported stomach or abdominal pain. Dr. Knoll's diagnostic impressions indicated that Plaintiff's Crohn's disease was "stable" with additional notes that appear to provide additional significant information. More on this later. *See infra*, § VI.

In June 2009, Plaintiff reported abdominal pain. His weight was down to 198 pounds. Dr. Knoll diagnosed Crohn's disease but did not add the term "stable." *Id.* at 427-28. By December 2010, Plaintiff's weight was down to 174. He reported that he felt better since taking prednisone. It was noted that Plaintiff had not started on Humira. His examination findings were normal. *Id.* at 419-20.

### Good Samaritan Hospital

Plaintiff underwent an abdominal CT in early December 2010 due to abdominal pain and history of Crohn's disease. The CT showed bowel-wall thickening and inflammatory changes. The radiologist noted the findings are consistent with an infectious/inflammatory process, related to his history of Crohn's disease. *Id.* at 770-71.

---

[2] Because the ALJ found Plaintiff disabled starting on May 31, 2014, this review discusses the evidence concerning his health before May 31, 2014.

Plaintiff was seen in the emergency room on July 25, 2013, complaining about increasingly severe abdominal pain that had started the week before. His pain was in his right-lower quadrant, and he reported that his last Crohn's flare-up was approximately a year earlier. *Id.* at 765. Examination revealed multiple abdominal surgical scars, significant voluntary guarding, and generalized tenderness with pain primarily in his right-lower quadrant. *Id.* at 766. High-pitched bowel sounds were also found. *Id.* A CT revealed, among many things, moderate bowel-wall thickening in the distal small bowel/ileum, suggestive of inflammatory/infectious process; cholelithiasis (gallstones); small-left-ventral hernia, containing a portion of the small bowel and small kidney stones. *Id.* at 768-69. Plaintiff was started on prednisone. *Id.* at 767.

On August 6, 2013, Plaintiff went to the emergency room with abdominal pain for the previous two days and low-back pain. *Id.* at 752-64. On examination, his bowel sounds were normal, he exhibited a normal range of motion, with no tenderness to the back and normal sensory and motor. A description of another abdominal CT states: "1. Inflammatory changes in the right abdominal/pelvic mesentery with adjacent wall thickening of small bowel loop. This was noted on the prior study of 7/25/13. Adjacent thickened bowel noted more superiorly on that exam appears very slightly improved from prior exam. This could represent inflammatory or infectious ileitis…. 2. Left ventral abdominal wall hernia containing a portion of a single small bowel…." *Id*. at 755. Plaintiff was treated for his pain and was to follow-up with his primary care physician and gastroenterologist. *Id.* at 756.

A treatment note from August 2014 written by a physician states, in part, "He underwent colonoscopy in June by my partner Dr. Beck and he had active Crohn's disease of the internal ileum. He was discharged on 60 mg of prednisone per day and has been on that ever since. He now has [health] insurance…. He has been seeing Dr. Knoll intermittently since 1999." *Id*. at 1432.

### Morris Brown, M.D.

In August 2013, Plaintiff saw his primary-care physician, Dr. Brown, for follow-up of anemia, abnormal-weight loss, regional inflammation (enteritis) of his small and large intestines, and generalized abdominal pain. *Id.* at 785. When discussing his history, Dr. Brown noted that abdominal pain prohibits Plaintiff from walking distances, limits his sitting, prohibits him from turning, twisting, bending, and running. *Id*. This pain also causes him difficulty with his activities of daily living such as rising from bed; sleeping soundly, lifting, performing household chores, and driving (impossible at times). *Id*. He has been hospitalized several times, for partial colectomy, and multiple blood transfusions. *Id.* at 786. On examination of his abdomen, Plaintiff's bowel sounds were diminished. He had no masses, rebound tenderness, or cerebrovascular tenderness on palpation. He exhibited guarding, left upper quadrant tenderness, epigastric tenderness, right upper and lower quadrant tenderness. Dr. Brown noted Plaintiff "IS TOTALLY PERMANENTLY DISABLED." *Id.* at 787 (capitalization in original). There is no indication in these records whether Dr. Brown believed that Plaintiff's Crohn's disease was partially or fully stable, or was unstable. *Id*. at 782-96.

### Edmond Gardner, M.D. and Michael Delphia, M.D.

Dr. Gardner reviewed Plaintiff's medical records in November 2013 and opined that Plaintiff could perform the full range of medium work as of December 2012 and could perform a range of light work starting in November 2013. (Doc. #6, *PageID*#s 161-63. His ability to perform light work, according to Dr. Gardner, was tempered by his inability to climb ladders, ropes, or scaffolds; and his ability to occasionally stoop, kneel, crouch, crawl, and climbing ramps and stairs. Dr. Gardner also believed that Plaintiff must avoid all exposure to hazards, including hazardous heights and commercial driving. *Id.*

In February 2014, Dr. Delphia reached the same conclusions as Dr. Gardner concerning Plaintiff's ability to perform a limited range of light work. *Id.* at 207-09.[3]

### IV. "Disability" Defined and the ALJ's Decision

Plaintiff's eligibility to receive Disability Insurance Benefit and Supplemental Security hinged on whether he was under a "disability" as defined by social security law. *See* 42 U.S.C. §§ 423(d)(1)(A)-(d)(2)(A), 1381a; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). To determine if he was under such a disability, ALJ Chaykin evaluated the evidence under the Social Security Administration's 5-step evaluation procedure. 20 C.F.R. § 404.1520(a)(4). The ALJ began by establishing December 31, 2012 as the date Plaintiff was last insured under the Disability Insurance Benefits program. (Doc. #6, *PageID* #103). Then, moving through step 1 of the sequential analysis, the ALJ found at steps 2 and 3 that Plaintiff's impairments—including his severe impairments of "inflammatory bowel disease (Crohn's disease and acid reflux), sleep disorder, cardiac

---

[3] The administrative record also contains Plaintiff's medical records during his incarceration from January 2011 to November 2012. *See* Doc. #6, *PageID* #s 499-744.

arrhythmia and spinal disorder"—did not automatically entitle him to benefits before May 31, 2014. *Id*. at 103-06.

At step 4, the ALJ found that before May 31, 2014, the most Plaintiff could do despite his impairments—his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was light work with nine enumerated limitations, including, for example, "(1) lifting up to 20 pounds occasionally and 10 pounds frequently; (2) standing and walking up to 6 hours; (3) sitting up to 6 hours…; [and] (9) the individual will be off task 5% of the workday in addition to normal breaks." (Doc. #6, *PageID* # 106). The ALJ also found at step 4 that Plaintiff could no longer perform his past work as a janitor or machine operator. *Id*. at 110.

ALJ Chaykin found at step 5 that Plaintiff could have performed (before May 31, 2014) a significant number of jobs that exist in the national economy such as survey worker, production assembler, and mail clerk. *Id*. at 111. This led ALJ Chaykin to conclude, in the end, that Plaintiff was not under a disability and not entitled to benefits before May 31, 2014. *Id*. at 111-13.

V.  **Standards of Review**

The present review of ALJ Chaykin's decision determines whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). If he failed to apply the correct legal criteria, his decision may be fatally flawed even if the record contains substantial evidence supporting his findings. *Rabbers*, 582 F.3d at 651; *see Bowen*, 478 F.3d at 746; *Wilson v. Comm'r of*

9

*Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). Substantial evidence supports a finding when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

## VI. Discussion

As previously indicated, the parties' dispute focuses mainly on ALJ Chaykin's consideration of the impact Plaintiff's Crohn's disease had on his ability to work before May 31, 2014.

ALJ Chaykin recognized that Plaintiff underwent a colon resection after suffering a gunshot wound in 1994 and that he was later diagnosed with inflammatory bowel disease (Crohn's disease and acid reflux). ALJ Chaykin then wrote:

> Treatment notes document moderate to severe diffuse abdominal pain, diffuse abdominal tenderness, loose stools, rectal bleeding, a duodenal ulcer, chronic anemia, acid reflux, fatigued appearance, diminished or high-pitched bowel sounds, and voluntary guarding (Exhibits 3F, 4F, 7F, 8F, 12F, 16F and 19F). The claimant alleges frequent diarrhea, frequent trips to the restroom, gastrointestinal bleeding, heartburn, difficulty swallowing food, weight loss, fatigue, intermittent nausea and vomiting, and whole body pain including abdominal pain, cramping and discomfort…. Past treatment modalities include prescription medication including pain medication, surgical intervention and blood transfusion (Exhibits 3F, 4F, 5F, 8F and 19F). Nonetheless, prior to May 31, 2014, treatment notes typically describe the claimant's Crohn's disease as stable (Exhibit 3F).

(Doc. #6, *PageID* #s 106-07).

The ALJ's findings, however, are not accurate. The treatment notes in Exhibit 3F, while using the descriptor "stable," do not indicate the status of his condition at the time it

10

was "stable." A "stable condition" in medical lexicon "indicates that the patient's disease process has not changed precipitously or significantly." Taber's Cyclopedic Medical Dictionary, 1955 (19th Ed. 2001). Given this definition, when medical professionals use the term stable to describe a person's condition, its meaning relates to the patient's actual condition rather than equating stable with an asymptomatic or not serious condition. *Cf., e.g., Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1228 (11th Cir. 2011) ("Dr. Rosenfeld characterized Moore's conditions as 'chronically stable,' a term he used to describe 'children who are going to never get better who are ... very ill, but who are stable in the sense that ... the disease process is not getting worse, not getting better, and they're not requiring hospitalizations ….'"). For example, in medical parlance, a patient in a medically induced coma could be stable; a patient restricted to bed rest due to immobilized fractured vertebrae could be stable; or, an asymptomatic patient with a chronic disease (such as Crohn's disease or some types of cancer) could be described as stable. Additionally, the adjective "stable" when describing a patient's Crohn's disease does not necessarily mean asymptomatic. Crohn's disease symptoms "may vary over time and from person to person…." https://www.crohnsandcolitis.com/crohnsdisease/symptoms (search "Crohn's Symptoms" database). It was therefore unreasonable for the ALJ to seize upon indications in Plaintiff's medical records that his Crohn's disease was at times "stable" without considering the medical context in which it was used. Treatment notes, moreover, indicating that Plaintiff's Crohn's disease was stable are, at times, unintelligible (at least to a lay person), *e.g.,* Doc. #6, *PageID* #s 430, 436, and seem to qualify the term "stable" to mean that Plaintiff's Crohn's disease caused him ongoing problems. On November 26,

11

2007, Dr. Knoll's diagnostic impression indicates Plaintiff's Crohn's was stable "but not [unintelligible] control." *Id*. at 434. This might mean that Plaintiff's Crohn's disease was "stable but not under control" or "stable but not normal control" or "stable but not good control" or some other qualification of the term "stable." *See id*. Whatever meaning Dr. Knoll intended, the ALJ improperly failed to consider the term in context and unreasonably assumed Dr. Knoll meant that Plaintiff Crohn's disease was not problematic before May 31, 2014.

The ALJ next found that Plaintiff had been noncompliant with his treatment regimen for Crohn's disease, stopped his medication without consulting his physician, and went two to three years without seeing his gastroenterologist for Crohn's disease. The ALJ explained, "Poor compliance reflects poorly on the claimant's allegations about the severity of his symptoms." *Id*. at 107.

When considering an applicant's credibility, "the individual's statements may be less credible if the level or frequency of treatment of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case records, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, *7 (July 2, 1996).[4] Examples of proper

---

[4] The Commissioner most recent credibility Ruling[4] did not change this: "SSR 16-3p does not alter the rule

considerations include, "The individual may not take prescription medication because the side effects are less tolerable than the symptoms," *id.* at *8, and "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id*.

      The ALJ erred by failing to consider any reasons for Plaintiff's decision not to take certain prescribed medications or not seek treatment from his gastroenterologist Dr. Brown. There were such reasons to consider. Plaintiff testified that Humira and Remicaid injections were not helpful and actually caused his condition to worsen from serious side effects. *See* Doc. #6, *PageID* # 143-44. Treatment notes tend to confirm this testimony. By February 2011, Plaintiff had tried both Humira and Remicaid to treat his Crohn's disease but these medications worsened his condition. *Id.* at 571. The ALJ also found that Plaintiff went "2-3 years without seeing his specializing physician" but failed to mention that he followed up with treatment once he obtained health insurance. *See id.* at 1432. This is even seen in the page of the record cited by the ALJ in support of his finding that Plaintiff "has gone 2-3 years without seeing his specializing physician for this condition (Exhibit 19F/6 [*PageID* #1111]…." This page of the record tells more than the ALJ recognized. It says, "Patient states that he has a history of Crohn's disease although [he] has not been seen by his GI doctor for about 2-3 years <u>because he does not have health insurance</u> …." *Id.* at 1111 (emphasis added). Consequently, the ALJ erred by drawing inferences about Plaintiff's credibility without considering the evidence as required by SSR 96-7p, 1996 WL 374186,

---

that the ALJ should consider "possible reasons" why a claimant failed to seek medical treatment 'consistent with the degree of his or her complaints' before drawing an adverse inference from the claimant's lack of medical treatment." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (quoting, in part, SSR 16–3p, 2016 WL 1119029, *8 (March 16, 2016).

\*7-\*8. *Cf. Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (citation omitted)). It was also error for the ALJ to cherry-pick only evidence that tends to support a non-disability decision—e.g., Plaintiff had not seen his GI doctor in 2-3 years—without considering its accompanying explanation—his lack health insurance. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis).

The Commissioner, citing specific pages of the medical records, contends that substantial evidence supports the ALJ's findings about Plaintiff's Crohn's disease. *See* Doc. #10, *PageID* #s 2146-48. Yet, the ALJ did not cite the specific pages of the record or the specific information referred to by the Commissioner concerning Plaintiff's Crohn's disease. To this extent, the Commissioner improperly relies on *post hoc* rationalizations to substitute for the ALJ's deficient consideration of Plaintiff's Crohn's disease before May 31, 2014. "In reviewing an ALJ's findings and conclusions, this Court shall not 'accept appellate counsel's *post hoc* rationalization for agency action in lieu of [accurate] reasons and findings enunciated by the Board.'" *Keeton v. Commissioner of Social Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) (quoting, in part, *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991)). In the Sixth Circuit, this principle is tempered by the possibility of harmless error for the reasons set forth in *Miller v. Berryhill*, No. 3:16cv00094, 2017 WL 1021313, at \*8 (S.D. Ohio 2017). Yet, the possibility of harmless error does not help the Commissioner in the instant case because Plaintiff points to sufficient medical evidence to

14

demonstrate that the ALJ missteps were not harmless. *See* Doc. #7, *PageID* #s 2131-32 (and evidence cited therein).

Plaintiff also contends that the ALJ erred by placing great weight on the record-reviewing physicians' opinions by failing to evaluate their opinions as Social Security regulations require. The Commissioner maintains that the ALJ did not have to mention every regulatory factor that is potentially applicable to such opinions and the ALJ found that Plaintiff was more limited than the record-reviewing physicians, Drs. Gardner and Delphia, identified.

The ALJ placed great weight on the opinions provided by Drs. Gardner and Delphia as "accurate reflections of the claimant's limitation at the time of their evaluations. However, the undersigned finds the claimant's conditions have worsened since the issuance of these opinions." (Doc. #6, *PageID* #108). Plaintiff acknowledges that ALJs are not generally required to discuss all the factors identified in the regulations for weighing a record-reviewing medical source's opinions. *See* 20 C.F.R. §§ 404.1527(c)(3)-(6); *see also* Doc. #11, *PageID* #2155. In the present case, however, the ALJ placed great on the record-reviewers' opinions essentially because he agreed with them. *See* Doc. #6, *PageID* #6, *PageID* #108 (explaining that their opinions were "accurate reflections of the claimant's limitations."). Doing so, the ALJ omitted any meaningful explanation grounded in the regulatory factors for the weight he placed on these physicians' opinions. *Cf. Dapice v. Comm'r of Soc. Sec.*, 2015 WL 4540538, at *6, n.5 (S.D. Ohio 2015) ("the lack of any meaningful analysis of any of the opinions offered by these four [state-agency] medical sources fails to comply with the requirements of 20 C.F.R. § 416.927 and therefore,

substantial evidence fails to support the ALJ's according these opinions 'significant weight.'").

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

**VII.** **Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own Regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence

16

of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, an ALJ should be directed to evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings, and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability before May 31, 2014 and whether his applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

## IT IS THEREFORE ORDERED THAT:

1. The Commissioner's finding that Plaintiff was not under a disability before May 31, 2014 is vacated;

2. No finding is made as to whether Plaintiff Donald L. Garrett was under a "disability" within the meaning of the Social Security Act before May 31, 2014;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.


March 28, 2018                                            *s/Sharon L. Ovington*
                                                                          Sharon L. Ovington
                                                                          United States Magistrate Judge